DECISION
Before this Court is an appeal from a decision of the Zoning Board of Review of the Town of Cumberland (Zoning Board). The petitioner, Calvi Realty, seeks either a reversal of the Zoning Board's decision denying its application for special use permit or a remand to the Zoning Board. This Court possesses jurisdiction pursuant to G.L. 1956 § 45-24-69.
 Facts/Travel
The subject property is designated as Assessor's Plat 12, lot No. 54, and is located at 20 Mendon Road. The property is zoned C-2. The petitioner sought a special use permit for a general service gasoline sales and automotive service station. The service station would contain six gasoline pumps and require the storage of 20,000 gallons of petroleum. The property upon which the petitioner sought permission to install the self-service gas station contained an existing Super Stop 
Shop Supermarket.
Under the Cumberland Zoning Ordinance, a gasoline service station is a conditionally permitted use in a C-2 zone and is permitted if the applicant obtains a special permit from the Zoning Board. The Cumberland Zoning Ordinance, Appendix B, Section 9-8(c)(2) provides that in granting a special use permit, the Board shall require evidence demonstrating
 "a. [The] [s]pecial use is specifically authorized by this appendix, and setting forth the exact subsection of this appendix containing the jurisdictional authorization;
 b. [The][s]pecial use meets all the criteria set forth in the subsection of this appendix authorizing such special use; and
 c. Granting of the special use permit will not alter the general character of the surrounding area or impair the intent or purpose of this appendix or the comprehensive plan of the town."
In addition to the requirements for a special use permit, if a special permit is sought for a development within a floodplain, then the provisions of the Flood Damage Prevention Ordinance would have to be satisfied for a special permit to be authorized.[1] Cumberland Flood Damage Prevention Ordinance § 17-1. The Flood Damage Prevention Ordinance provides that "uses which would otherwise be permitted by the Cumberland Zoning Ordinance may be permitted only by special use permit after the zoning board of review has established that the overall purposes of this chapter have been carried out." Flood Damage Prevention Ordinance § 17.5. The purpose of the Flood Prevention Ordinance is
 "(1) To avoid or lessen the various hazards to persons, or the damage to property resulting from the accumulation or runoff of storm and flood waters.
 (2) To protect floodways from encroachment.
 (3) To maintain the capability of floodplain to retain and carry off flood waters.
 (4) To provide for the development of floodplain with uses not subject to severe damage by flooding and which are compatible with other uses permitted in the various zones.
 (5) To permit only uses and improvements to the floodplain that are not hazardous during flood periods.
 (6) To establish areas in which the elevation and floodproofing of structures and other developments must be regulated.
 (7) To avoid the creation of new flood problems.
 (8) To compliment [sic] and enhance an overall conservation program established by the town and contained in the Comprehensive Community Plan 1991-2010. . . ." Flood Damage Prevention Ordinance § 17-2.
The Zoning Board held hearings addressing whether the special permit could be granted under the Cumberland Zoning Ordinance and Flood Prevention Ordinance. The petitioner presented testimony demonstrating that the proposed gas station would not have a negative environmental impact on the surrounding area. The petitioner also presented expert testimony from Alexander Trakimas, a civil engineer who specializes in commercial development with an emphasis on retail petroleum. (Tr. of September 8, 1999 at 60.) Trakimas explained that the design of the fuel facility is environmentally safe to prevent leakage of fuel. (Id. at 64.) He testified that the underground storage tank is a doublewall underground storage tank and that the dispensing lines leading from the storage tank to the fuel dispenser are also doublewall design as well. (Id. at 63.) Additionally, Trakimas testified that the system's piping has a triple containment because it is located within a duct system. Id. Moreover, Trakimas testified that the entire system is electronically monitored for any leakage within the doublewall containment. Id.
In addition, the Board heard the testimony of Robert Ferrari, a registered professional engineer in Rhode Island and an expert in the area of underground storage tanks, combustible materials, and flammable materials. Mr. Ferrari testified that the fuel system was designed to take extra precautions to prevent environmental hazards. (Id. at 89.) To accomplish this, he testified that the system was designed to use a monolithic concrete slab beneath the tank which would inhibit the tank from moving in the event of a flood. (Tr. of September 8, 1999 at 88.) According to Mr. Ferrari's testimony, the safety features of the fuel facility system create no greater environmental risk installing the system within a floodplain than outside a floodplain. Id. Mr. Ferrari testified that there are at least 17 gasoline fueling facilities in Rhode Island that have been built in 100-year floodplains. (Id. at 89.) Moreover, Mr. Ferrari testified that the facility has undergone a rigorous review by the Rhode Island Department of Environmental Management, including the Wetlands Division and Underground Storage Tank Division. (Id. at 90.)
Along with the design features of the fuel facility that ensure safety, Ferrari attempted to demonstrate, using a mathematical calculation, the design safety of the fuel facility. He calculated the sour velocity of the gravel that would surround the underground storage tank and hold it in place. (Tr. of October 13, 1999 at 24.) Sour velocity is the speed of water necessary to move a particular object, at rest, into the current of water. Id. According to Ferrari's testimony, one-eighth inch would be the size of the smallest particle in the gravel fill. Id. Consequently, Ferrari testified that even if the gravel were exposed to a 100-year flood event, it would not be moved because the velocity of the water would be insufficient. (Id. at 26.) Ferrari asserted that even in a 100-year flood, the structural integrity of the fuel facility would preclude any uplift or damage to the system. (Id. at 24.)
Mr. Ferrari testified that considering Cumberland's Flood Damage Prevention Ordinance, the system posed no increased risk due to the design of the system. (Id. at 94.) Addressing the possibility of erosion of the system, he testified that there was no possibility of any significant erosion that would do anything more than stain the surface of the asphalt or concrete. (Id. at 96.)
The Town of Cumberland presented testimony in opposition to the petitioner's special use permit. Stephen Kerns, Chairman of the Blackstone Watershed Council, testified that installing a gas pump so close to the flood zone presents a serious environmental risk to the Blackstone River. (Tr. of October 13, 1999 at 63.) Moreover, he stressed that government agencies and private citizens have been attempting to clean the river. Additionally, Frank Geary, Chairman of the Cumberland Conservation Committee, also testified in opposition to the special use permit due to the potential environmental harm to the river. (Id. at 66.) The Town also put forth its own expert witnesses who testified that the gas station would have a negative environmental impact. Mr. Caito, a registered professional engineer, testified against the environmental safety of the fuel facility by observing that there is a possibility for erosion to take place and for material to start to unravel in a flood condition. (Tr. of October 13, 1999 at 100.) Caito testified that the tank could become destabilized if a flood were to occur because particles in the gravel fill smaller than one-eighth inch could destabilize the tank, causing a leak. (Id. at 98.) Caito testified that destabilization can be caused by small shifts in the position of the gravel. (Id. at 99-100.)
Furthermore, Caito challenged Ferrari's assumption that the velocity of the water during a flood would remain the same over time. Caito stressed that changing development in the area would increase the water velocity because water moves faster when it has to move around structures. (Tr. of October 13, 1999 at 102-03.) Accordingly, Caito's testimony contradicted Ferrari's conclusions regarding the water velocity and the safety of the system in flood conditions.
In addition to Mr. Caito, the Town also presented expert testimony from Mr. Pastore, who has experience in groundwater geohydrology and structural engineering. Moreover, he has been operating president of R.P. Engineering for 10 years, which has been involved in underground storage tanks, hazardous waste, site remediation and structural design. (Tr. of October 13, 1999 at 112.) Mr. Pastore testified that because the wetlands that exist alongside the Blackstone River extend 200 feet from the edge of the river, any fuel spill would only have to reach the wetlands to enter the watercourse. (Id. at 118.) Thus, Mr. Pastore found the fuel facility environmentally unsafe given its location.
On October 13, 1999, the Zoning Board denied the petitioner's application for the special permit. The Board concluded that the proposed development was "not environmentally good for the area and that it would create too much of a risk." (Exh. B). Furthermore, the Board found that the conditions "under which a special use permit should be granted have not been met by the evidence or by the weighing of evidence and that the burden of showing that the proposed use would not be inimical to the public health, safety and welfare has not been shown." Id. Moreover, the Board also concluded that the proposed development would violate the Cumberland Flood Damage Prevention Ordinance. Id.
The petitioner timely appealed the Board's decision to this Court. On appeal, the petitioner raises several arguments challenging the legal basis of the Board's decision. First, the petitioner attacks the enactment of the Cumberland Flood Damage Prevention Ordinance as being improperly enacted and void as a matter of law. Second, the petitioner contends that the Zoning Board improperly accepted lay witness testimony in areas that require expert testimony. Third, the petitioner argues that the Zoning Board's decision was clearly erroneous in light of the reliable and competent evidence before it and that the petitioner did satisfy the conditions imposed by the special use permit section of the Ordinance. Finally, petitioner contends that the Board's decision is affected by error of law because the Board's decision is inadequate under General Laws § 45-24-61.
 Standard of Review
The standard of review for this Court's appellate consideration of the Zoning Board decision is articulated in G.L. 1956 § 45-24-69(d), which states:
 "(D) The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 (1) In violation of constitutional, statutory or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When reviewing a zoning board decision, this Court must examine the entire certified record to determine whether substantial evidence exists to support the finding of the board. Salve Regina College v. Zoning Bd.of Review, 594 A.2d 878, 880 (R.I. 1991) (citing DeStefano v. Zoning Bd.of Review of Warwick, 122 R.I. 241, 245, 405 A.2d 1167, 1170 (1979));Restivo v. Lynch, 707 A.2d 663 (R.I. 1998). "Substantial evidence as used in this context means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means in an amount more than a scintilla but less than a preponderance." Caswell v. GeorgeSherman Sand and Gravel Co., Inc., 424 A.2d 646, 647 (R.I. 1981) (citingApostolou v. Genovesi, 120 R.I. 501, 507, 388 A.2d 821, 825 (1978)). The essential function of the zoning board is to weigh evidence with discretion to accept or reject the evidence presented. Bellevue ShoppingCenter Associates v. Chase, 574 A.2d 760, 764 (R.I. 1990). Moreover, this Court should exercise restraint in substituting its judgment for that of the zoning board and is compelled to uphold the board's decision if the Court "conscientiously finds" that the decision is supported by substantial evidence contained in the record. Mendonsa v. Corey,495 A.2d 257 (R.I. 1985) (quoting Apostolou v. Genovesi, 120 R.I. 501, 507, 388 A.2d 821, 825 (1978)). It is only if the record is "completely bereft of competent evidentiary support" that a board of appeal's decision may be reversed. Sartor v. Coastal Resources Management Councilof Rhode Island, 434 A.2d 266, 272 (R.I. 1981). A remand is
 `"intended as a safety valve, permitting the reviewing court to require a second look at situations and conditions which might not warrant reversal, but which, to the court reviewing the record, would indicate to it that the . . . [agency] may have acted on incomplete or inadequate information; or may have failed to give adequate consideration to an alternate route * * *.
 `"A remand for further consideration is not a determination that the [agency] is wrong; but it is an indication that the disinterested court, which has reviewed the record, is not satisfied on the basis of that record that the [agency] is right.'" Johnston Ambulatory Surgical Assocs. v. Nolan, 755 A.2d 799, 816 (R.I. 2000) (Flanders, J., concurring in part and dissenting in part) (citing Lemoine v. Dept. of Mental Retardation and Hospitals, 320 A.2d 611, 615, 113 R.I. 285, 291 (R.I. 1974) (citations omitted)).
 Adequacy of Decision
General Laws § 45-24-61 provides:
 "Following a public hearing, the zoning board of review shall render a decision within a reasonable period of time. The zoning board of review shall include in its decision all findings of fact and conditions, showing the vote of each participating member, and the absence of a member or his or her failure to vote."
The Rhode Supreme Court has emphasized that § 45-24-61 mandates that "a zoning board of review is required to make findings of fact and conclusions of law in support of its decision in order that such decision may be susceptible of judicial review." von Bernuth v. Zoning Board ofReview of the Town of New Shoreham, 770 A.2d 396, 401 (R.I. 2001). The Court has stated that its task in reviewing zoning board decisions is to "decide whether board members resolved evidentiary conflicts, made the prerequisite factual determinations, and applied the proper legal principles. Those findings must, of course, be factual rather than conclusional, and the application of the legal principles must be something more than the recital of a litany." Id.; Sciacca v. Caruso,769 A.2d 578, 585 (R.I. 2001). Stressing this necessity that zoning boards articulate a factual and legal basis for its conclusion, the Court asserted that it will not search the record for supporting evidence or decide for itself what is proper in the circumstances. Irish Partnershipv. Rommel, 518 A.2d 356, 358 (R.I. 1986).
Given the strong pronouncements of the Supreme Court requiring zoning boards to articulate factual and legal reasons for their decisions, this Court must remand this matter to the Zoning Board to provide a fuller factual and legal basis for its decision, which would allow judicial review of the Board's decision by this Court. Here, following the conclusion of the October 13, 1999 hearing, the Board did not set forth any findings of fact or conclusions of law, but moved to deny the petitioner's application for a special use permit. The minutes of the Board's meeting provide the sole basis for discerning the factual and legal conclusions of the Board.
In its minutes, the Board did not set forth any findings of fact or conclusions of law, but moved to deny the petitioner's application for a special use permit. Based on the minutes of the Zoning Board meeting, it appears that Board member Ms. Connors represented the views of the members when she stated that the application was being denied because "we have found it environmentally not good for the area and that it would create too much risk." (Exh. B). Moreover, the Town Solicitor, Mr. Almeida, stated: "included in the motion should be a finding that the conditions under which a special use permit should be granted have not been met by the evidence or by the weight of the evidence and that the burden of showing that the proposed use would not be inimical to the public health, safety and welfare has not been shown." Id. Ms. O'Connor's stated that she would add Mr. Almeida's suggestion to the motion. Id. Also, the Board added to the minutes, at the request of Board Member, Mr. Bessette, a finding that the application did not comply with Cumberland Code § 17-6(g), requiring that no outdoor storage of materials or equipment shall be permitted in any special flood hazard area zone which is likely to cause damage to property, create a potential fire hazard or pollute the waters during flood periods. Id.
The Board failed to follow the directives of von Bernuth and Sciacca
that zoning decisions must reveal the factual findings relied on by the Board. Moreover, the Supreme Court underscored that the Board cannot merely recite the relevant law to justify its conclusions, but must apply the law to the facts as found by the Board. Sciacca, 769 A.2d at 585. Here, the Board reached the conclusion that the proposed use is environmentally "not good" for the environment without articulating a factual basis for this conclusion. Although the Board heard substantial testimony from both parties evaluating the environmental impact of the fuel facility, the Board failed to resolve this evidentiary conflict in order to reach its conclusion or reveal any factual basis for its conclusion. Our Lady of Mercy v. Zoning Board of Review of the Town ofEast Greenwich, 102 R.I. 269, 274, 229 A.2d 854, 857 (1967) (holding that a zoning board acting on an application for special exception must state the evidence on which it relies). The Board listed the legal principles that it believed mandated denying the special use permit without applying those principles to the facts presented in the record. Accordingly, this Court must remand this matter to the Board for a decision revealing the Board's findings of fact and application of law to the facts presented in the petitioner's special permit application.
 Conclusion 
This Court finds that the Zoning Board did not articulate reasons in a decision as required by General Laws § 45-24-61. Therefore, the Court need not address the petitioner's other arguments. The Court remands the matter to the Zoning Board for a decision that articulates its factual findings and applies the applicable law to those findings. This Court will retain jurisdiction.
Counsel shall submit the appropriate order for entry after notice.
[1] The petitioner contends that the Cumberland Flood Damage Prevention Ordinance was unlawfully and improperly enacted under General Laws §45-24-53.